The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the court is now sitting. God save the United States and this honorable court. Mr. Cooney, whenever you're ready. Thank you, Your Honor. If it pleases the court, I'm Jim Cooney of the Bar of the State of North Carolina and I represent the petitioner appellant John Edward Burr. When the state charged Mr. Burr with capital murder in the death of Theresa Sue O'Daniel, a four-month-old child, it did so on the theory that shortly after midnight on August 25th, 1991, and for reasons that have never been fully explained, Mr. Burr beat this child and inflicted a lethal brain injury on her. But in order to prove that theory, the state was going to have to grapple with three central issues. First of all, there were no witnesses. No one saw Mr. Burr hit, hurt, or harm that child. Mr. Burr denied it. He waived his rights. He consulted with the police, even took a witness stand at his trial. So whatever case the state was going to have to build was going to be a circumstantial case. The second issue we had to grapple with is the fact that within the time period where this lethal brain injury could have been inflicted, there was another event that took place. This child was being carried by Scott Engle, her brother, across the yard. He was running, tripped over a cord, and fell on top of her. So the state was going to have to exclude or at least minimize the fall to the extent it could be a positive factor in this lethal brain injury. The final issue the state had was when this child was brought to the hospital, x-rays revealed that this child had healing and old, comminuted fractures of the arms and legs, indicating abuse that had been going on for days and weeks. Mr. Cooney, Mr. Cooney, I hear what you're saying, but isn't that more than an age of a jury argument, a closing argument, to point out deficiencies in the state's evidence? What you perceive to be deficiencies in the state's evidence, is a perfectly fair comment, but I wonder why it's not a simple jury argument that you've made. I don't believe it is, Your Honor, because these deficiencies illustrate the criticality of the testimony of Lisa Bridges and Scott Engle, because it was through those two witnesses that the state addressed each of these issues. And it was through those two witnesses that the state minimized the fall and was able to imply that Scott Engle heard something that night consistent with John Burr hitting this child, and also implied that John Burr was the chronic abuser for this child, which was an important factor in getting the jury to believe he was capable of doing this. So all that evidence rested on the credibility of these witnesses, and it's that sort of thing. Well, you said it all rested on the credibility of those witnesses, but aren't we faced with the finding of the state PCR court from Alamance County as to the materiality, the chronicology? PCR court said that the evidence from Bridges was only tangentially relevant, and that the hesitation from Scott was immaterial because of the presence of so much other testimony. And I would point you to two things. You try to make a great deal out of the testimony of Bridges and Scott, but you are faced with contrary findings on the part of the state PCR court. And then there is the evidence which the PCR court, I'm sure, found far more significant, which was Mr. Burr's own testimony. He did take the stand, and the jury was the one that was in a position to make a credibility assessment of him, and I would think quite significantly that it depended on the jury's reaction to his own testimony. And then there is the overwhelming testimony from innumerable doctors about the fact that the alternative theory that you propose, which is that the damages arose from the fall from Scott dropping the child, that was up against a broad array of medical testimony that said this did not occur from the fall. And there were multiple witnesses also to trial who said they did not detect injuries to a lot of evidence there that led to the state court's finding about materiality of any testimony from Bridges or from Scott. And I would suggest to you that's a finding that we are not at liberty to disregard. It's critical that this comes from state court. Yes, Your Honor, and Your Honor is exactly correct that that's a finding I need to grapple with, and I grapple with it in this way because there was, first of all, the testimony of the doctors were based in part on the descriptions of the fall provided by Scott and Lisa Bridges. Counsel, sorry, it's Judge Harris. When it comes to the fall, let me just tell you my concern. I do feel like you're really pushing up against our earlier opinion on the ineffective assistance case. And I'm not saying it's exactly law of the case or anything, but we did hold there that just in light of the medical evidence and the fact testimony from the witnesses on the scene, there was no reasonable possibility that a jury could have found that the fall caused the death. And in light of that, I really am struggling with how any sort of discrepancies, and we can bracket for a minute whether they're significant, but even assuming there were some discrepancies in the description of the fall, how that could be material if we're sort of staying true to our earlier decision. Well, Judge Harris said earlier decision was reached, and of course, Judge Wilkinson was on the panel. But the earlier decision was reached in the context of claim of ineffective assistance of counsel. So the court was exercising double deference under its review, and I don't believe the court- Related in a sense to follow up on Judge Harris's point on the prejudice inquiry, ineffective assistance of counsel claim has got to be related to the materiality finding here that the PCR court made. In other words, they both, they may be phrased in slightly different terms, but they both go to the significance of the evidence and the part that the evidence played. So they're not unrelated in any real sense, and in a practical sense, that earlier finding, earlier decision, and the materiality question under Brady are actually quite intertwined. Well, Your Honor, I guess to the extent I can diverge from that, it's on this. Because the materiality inquiry under Brady and Kiles goes to the credibility of the witnesses and across an array of things. And what happened is this post-conviction court chose to do kind of a point-by-point rebuttal of what was identified as favorable evidence that was withheld. What the court didn't do is what Brady and Kiles teach it's supposed to do. You take all the evidence in the aggregate, you put it, you consider it together, not a piece at a time. And then as Judge Wynn wrote in Juniper against Zook, you start adding and subtracting from the various burdens. So to the extent there's evidence favorable to the defense, it goes on the defense side and it gets subtracted from the state side. And we don't see that in the post-conviction court's second opinion. Well, I'm going to ask that because I think this is we could spend our time diving in as you approach this case because it does look like there's some shoehorning of the fall issue into the Brady and Napu type claims that you present. But even if we put aside these jury findings and the state MAR findings and our early decision that Judge Harris has made, you're still left with the question of what are the aspects of this claim? I think that's the heart of where you have to go here. We could go back and forth. I mean, you say there were only two witnesses to the fall. There was, in fact, Rita's cousin, Rita's son, who said he saw it. There were other witnesses talked about the bruises. So there you go into the weighing stuff that Judge Wilkerson say. And we can spend some time on that if you want, because I'll tell you, I've always been amazed by the genius of how these cases can move. I mean, you're talking about something that happened 30 years ago and it's still going on. So I'm amazed by that. And I don't, for one moment, pretend to say how you should proceed with it because I know you know what you're doing on it. But I think in this particular instance, to really address the issues before us in terms of as I presented them would be helpful. Yes. Yes. Otherwise, spend all your time talking about evidence, going back and forth. And I'll tell you, I don't see that going anywhere, but I could be wrong. So you go ahead. No, I appreciate the friendly advice. And let me begin with Lisa Bridges. So we have a number of things in Lisa Bridges' interview that certainly would have been helpful. And in the hands of competent defense counsel could have been used under minor testimony on four separate occasions in her interview. She talked not only about the fact that she did not see John Burr harm the child, but she never thought he was capable of harming the child. That her first reaction each time she was confronted about what's going on with this child, they would must have been the fall. It's not John Burr. Defense counsel wasn't given that evidence. They didn't have a chance to ask that and told her family, don't tell them that Susie's been crying. Don't tell them anything that she was other than a normal, happy, healthy child before August 25th. And it got to the point where the prosecutors in the suppressed statement said to her, wouldn't sounds like a script. And she said, well, I did it because I didn't want to look bad. And once again, it goes to who's Susie's prosecutor. Prosecutors suggest to her that the Department of Social Services could potentially reopen the case. And she needs to be careful about her testimony. There's an extensive discussion in the suppressed statements where the prosecutors go through the evidence with her and are coaching her. Don't say that bruise was there because that bruise was inflicted in the hospital. This bruise may not have been. I mean, I don't, don't as far as the prosecutors interview, don't we have some detailed findings again from the state PCR court of Alamance County, but I'm quoting from it. The content of the statements quote demonstrates that prosecutors were merely trying to determine the true facts and to prepare the witnesses to provide truthful testimony. And then they go on with 10 subsidiary findings before they came in. And the district court found the same thing in this case that there wasn't any kind of coaching or any kind of natural attempt to procure a perjured testimony that it would, in fact, doing what counsel does quite frequently, that is just trial preparation, trying to get witness to tell the truth. And it seems to me that you're faced with adverse findings all over the place from the state PCR court. And I worry because the case books are full of the Supreme Court telling us to respect the state judicial process and their procurium reversals from refusals to do so. And so I think there's an institutional interest that we have here in paying respect to those state court findings. This is a personal matter. This is a troubling case, not necessarily as a legal matter, but I just have to say to you, and I think it's all the more admirable that you're a lot of times these capital cases are grisly and horrific beyond belief, but this is maybe one of the saddest cases that I've sat in, the mutilation and bruising of a very young child. It's so sad. And I guess that goes and enhances my admiration for you to take on in a very able way what is a very sad case. I appreciate that. Your Honor, I'm out of time. Oh, I'm sorry. Can I ask one question that sort of goes to what you were talking about? Is that all right, Judge Wilkinson, if I ask one last question? It certainly is all right. Just one. So you were talking about parts of the transcript where you might be able to make a case that Lisa Bridges was not being really honest about the degree to which she understood there had been some prior abuse of the baby. And I guess my question is, even if that were true, fine, the jury thinks that she is not being entirely straight about how much she knew about what was going on before. I'm not even, can you explain to me why that would have mattered so much? Wouldn't the jury still in a case like this? I mean, there was no alternative account that sort of put her, I guess my question is so what? And I don't mean to be flip at all. I agree with Judge Wilkinson. It's a really sad case, but I could imagine as a juror thinking this woman probably did have some inkling of what was going on, but that doesn't mean she did it and that the in the Brady cases where the court has said that this kind of impeachment evidence is material, it's because if you disbelieve the witness, like the case is over, that's the only evidence, it's eyewitnesses. As you said, this is not an eyewitness case, but the Supreme Court's Brady cases on impeachment, it's all eyewitnesses who say, I was there, I saw the defendant do it. And then it turns out there's reason to disbelieve that testimony. And I guess I should stop talking and let you answer. I'm sorry. Oh, no, that's quite all right, Judge Harris. So the importance of this isn't that she didn't suspect what was going on. The importance of this is he wasn't the abuser to begin with. And it goes to that thing that prosecutors say they don't have to prove, but they really do, which is motive. What would possess John Burr to inflict a beating on this child at that time and at that place? And you've got to prepare the jury that this is the kind of person that would do that. But if, in fact, either Lisa Bridges is the abuser or members of her family are the abuser, instead of John Burr, and remember, the only evidence of that is Scott Engel's brand new recollections just before trial, that somehow he suddenly remembered John Burr shook the baby on a bed on a few occasions. If you don't have that, or you're able to undermine that, it makes it less likely that this man out of the blue would suddenly decide, now's a good time for me to beat this child. And what it does is it both establishes what is she covering up for? Why is she having her family lie for her? Why are they all talking from, as the prosecutors say, a script? What's going on here? And that absolutely goes to the jury's ability to find. It can only be John Burr. I hope that addresses your question. Thank you, sir. But I'm going to ask Judge Harris if she has further questions. Oh, thank you. Judge Wynn, do you have any questions you would like, further questions you wish to ask Mr. Cooney? Not at this time, Judge. Thank you. All right. Thank you, Mr. Cooney. You have some rebuttal time. We'd be happy to hear from you then. And Ms. Callahan, whenever you're ready, we would... Yes, Your Honor. Good morning. Please proceed. May it please the court, my name is Kimberly Callahan, floor respondent at Pelley. Susie O'Daniel died from multiple head traumas. As has already been discussed in this case, her injuries were horrific, so I won't go through each of them. But the unanimous medical opinion at trial was that her head injuries resulted from whiplash, from being shaken back and forth, and blunt force trauma that had to be so great, it was analogous to being ejected through a windshield at 60 miles an hour and hitting a tree. It's really hard to address this case. It's so tempting to go back and try to relitigate it. Judge Wilkerson hit on something that this is a difficult case, and the reasons he's given in terms of the victim is particularly strong. What's also strong is there's a lot of evidence in here where, as the defense counsel puts forth, you really don't have a direct witness, but you've got a lot of circumstantial evidence. And the end of the day is, all that's been done over the last 30 years, and I kind of understand that. And at some point in time, you got to accept the juror's verdict. But we do have these issues here, and so I think the focus, Judge Harris's last question, really goes to the focus, particularly with the Brady claim, and you have the NAPU claim, here, insofar as where are we in this proceeding now? And would this have made a difference? So if you will approach the issues in this case, I think that we've been sensitized enough in terms of exactly what the facts were in this case. Well, not exactly, but really a strong indication. They're horrible. We could spend our time going back on whether the fall made a difference, whether or not he was wrong, and touching on a lot of policy issues, but we've got these couple of issues here, and I'd like to hear you address them directly in terms of how the defendant has presented them. Certainly, Your Honor. If you look at defendant's Brady claim, it's based on the undisclosed interview concerning Lisa Bridges and Scott Ingles. He first mentions that she states in that interview that she never saw Johnny hurt Susie, and didn't think he would do it. Well, she said that at trial as well. It's on page 2076 of the joint appendix. Her 1993 interview is consistent with her trial testimony. The state reasonably found that the discrepancies between the interview that was undisclosed and her trial testimony were de minimis, and counsel hasn't shown that that's incorrect by clear and convincing evidence. Tell me, what is your position on the fact that the transcripts weren't released until 2015, and you can send it to their inclusion on the Rule 7 below. So, are you saying we can't consider those records, or do you still agree that we can? I would agree that you can and should look at them. I would also say that it wouldn't change the deference that is given to the state court here, because while the transcript of this other statement was not produced until 2015, it doesn't show any new evidence. It doesn't fundamentally alter his claims, and I think he said that in his motion to expand the record. So, it doesn't change the deference, and it doesn't show that the state court's findings were unreasonable here. So, while they certainly didn't have this transcript at the time, the substance of what's contained in this transcript was before the state court with these other interviews. In this connection, is the Martinez case relevant? Because we often see after the PCR ruling, we often say, well, there's this that came to light, or the PCR court didn't have a chance to do this, and Martinez, I think the Supreme Court said, well, when you keep putting in this evidence which contributes to the incredible length of these proceedings, there has to be a fundamental alteration of the claim, not just some embellishment of it, and I was wondering if that isn't an important decision here. Yes, Your Honor, I would say that it is, because this does not fundamentally alter his claim. This substance, there is no new evidence. I think that's a test, isn't it? A fundamental alteration test. Yes, Your Honor, and it doesn't alter here. There's nothing new in this 2015 transcript for anybody to consider. It's cumulative. It's what she testified to at trial. It's what's included in her 1993 interview that was disclosed during post conviction. There's no aha, oh, if I had this piece of evidence, it would have fundamentally altered his claim. It doesn't. It simply doesn't, and so I think you can consider it, but it doesn't change the standard of review to de novo review. It would still have some deference to the state court because it doesn't make the state court's findings unreasonable in light of this transcript. Should we approach this case in perhaps a different light? I mean, death penalty cases are handled somewhat differently. Typically by this stage, we are not really grappling with there's no question that something happened and what he did, he did it. We are dealing probably with sentencing issues and whether he should get life or get the death penalty. So it's a different posture when you get in. But at this point, it seems as though we're still, we've just not let go, even though they're not directly with us. And certainly the statute doesn't allow us to the merits of the case. And that's what's being touched on here with the Brady is there's some evidence here in what the defendant certainly believes is a very close case. Whether we characterize it close or not close, we're still talking about it to the extent that we really are talking about the merits of it, not the type of sentence one should get. So I mean, given our history in terms of how we've approached death penalty cases, they do get special rules. They do get special attention. The average case, you can't keep going this long. I don't care what you do. But a death penalty case we approach with a great deal of circumspection. So when we are confronted with this, the question then become, well, you know, if it's at some point in time, you wonder what would happen if you simply just says, OK, we'll look at it and determine if it would make a difference, that sort of thing. I mean, what my question is, you think this is a different type of case, this type of death penalty case, or do you think they all fit in the same cup? Well, certainly, Your Honor, the death cases are different. But I think if you look at this case, no matter how you look at it, the state did not violate Brady. The trial court, the state MAR court did not unreasonably find the facts here or apply the law. And I think if you look at the evidence that was presented at trial with regard to Lisa and Scott, it counters his claims that this material was Brady. I think what he wants, what he would want to get before the jury are basically the prosecutor's statements that were made in these interviews where they were prepping their witnesses, not her actual testimony. Your Honor, on the Brady claim, you stand on both the question of whether it's exculpatory and the question of whether it's material. Am I correct? Yes, Your Honor. I just wanted to make sure, I mean, there's several prongs to Brady. It doesn't require good faith or bad faith, but it does require that the evidence be exculpatory and it does require that the evidence be material. And I understand if you're standing on both prongs. Yes, Your Honor. If you look at Lisa's testimony, if her credibility was the sticking point of petitioner's claim. If you look at her trial testimony, it is consistent with her 1993 interview. If they wanted to impeach her testimony regarding the fall or any other thing that she testified to, they had earlier interviews from 1991 where she gave somewhat inconsistent statements about the circumstances of the fall, whether he actually dropped her or fell on her. She had statements where they had statement from Scott. His 1991 interview said he did drop her. So, if this is the central claim to their Brady argument, was that there's discrepancies between the descriptions of the fall, the defense counsel had that information. And in fact, the evidence at trial was so overwhelming that there was no that caused these injuries that the defense counsel repeatedly conceded in his case in chief and in closing argument that the fall with Scott did not cause Susie's injury. That was not the central issue at trial. And it's not relevant. What was the central issue? Was there an alternative theory put forth? I mean, the alternative theory that's developed over time has been that it was the fall from Scott. You say it wasn't an issue at trial. What was the issue? Was it simply this gentleman's credibility? But the issue at trial was who inflicted the mortal wounds on Susie. And the defense argued that the state did not meet its burden to prove beyond a reasonable doubt that it was Mr. Burr. The fall was not considered to be even relevant according to the defense. The defense's own statements at his trial. Because the medical evidence and as you pointed out, the testimony from witnesses, the testimony from Burr himself said that after this fall, there was no visible signs of bruising or any type of injury on Susie. So, the fall was not a central part of the trial. It was who committed these mortal wounds. Thank you. So, I understand what you're saying about the fall. And I agree with you that that's really the thrust of the Brady claim in this case. But there is, I think, this additional claim that, putting to one side the fall, the transcript just undermines Susie Bridges' credibility, kind of generally. And that's enough to sort of throw into question a lot about what's going on here in a kind of an atmospheric way, I guess. Just that if she's not credible, that's a problem. And that's something that defense should have known about. You address sort of the credibility end of this? The defense, they've not pointed to what evidence makes her so incredible. Well, I guess, I don't want to put words into the defendant's mouth here. But I think, why don't we start with the part where it really does seem like even the prosecutors think she's running around telling her family, whatever you do, don't let on to the fact that Susie had injuries before this. Act like everything was fine until this day. Certainly, Your Honor. So what the prosecutors were doing, they were coaching their witnesses. When they press Lisa about this subject, they say, this is not believable. Your story doesn't add up. I totally agree with you that on the NAPU side of things, I read the transcript. It looks to me like the prosecutors are begging her to testify truthfully, and that they don't think it's going to hold up if she keeps saying nobody had any idea there was a problem until the night this happened. But that does raise a question, I think, about her credibility, given that until that time, she is trying to pretend there was no problem until the night of the crime. And, Your Honor, I point you back to trial testimony, that she said the exact same thing at trial. She said, I did not believe that Burr was going to hurt her or hurt my children. Okay. Yeah, no, that seems like a slightly separate question. I understand what you're saying on that, too. I guess I'm just trying to, what I'm trying to get at, and this may not, you know, in the posture we're in, I'm not 100 percent sure it matters, but if I thought from reading that transcript that Lisa Bridges appears to have been asking family members perhaps to even testify untruthfully about Susie's status before the night in question, does that call into question her credibility in a way that would be material to the outcome of this case? If, perhaps, Your Honor, if she, that's actually what she said. Now, I don't have the page marked, but from my understanding of the transcript, the prosecutor, what she actually said was, I told my family not to tell the people that Susie was crying all the time because it'll make me look bad. It wasn't that I asked my family to lie for me and cover up this abuse that I knew was going on. She remains steadfast at trial and at every interview that she did not, she did not think and doctors told her this had to have been a child abuse case. She never waivers in that testimony and at trial or any other pre-trial interviews. So, I would, perhaps it would be a different case if she said, yes, I'm telling my family members to lie on my behalf, but that's actually what we have here. She says- In this regard, in this regard, about the whole issue of prior abuse, is it relevant here that multiple witnesses say that they did not detect any injuries to Susie after the fall with Scott? That would seem to me, to the court, that witness testimony would seem to me to cut substantially against the, any allegation of prior abuse when you say, no, we've got these witnesses here that did not detect these injuries after the fall with Scott and that would surely be relevant to the question of prior abuse, wouldn't it? Absolutely, your honor. Not only do we have witnesses, we have the petitioner himself testifying that after the fall Susie was fine. He even went so far to say as she was sitting on the front porch with Lisa and was smiling at him as he drove by on the lawnmower. And you have, and you have multiple, multiple witnesses testifying to that, but in, in addition, as I recall in the medical testimony, which was cumulative and quite substantial was that what happened here was a very recent trauma. These were not, you know, evidence of two or three years of chronic abuse, but that this was something that was, that was fresh. And of course, there's the additional point that Burr was alone with Susie at the moment that he could have caused the death. So, I think the trial did cover that question of previous abuse, at least to some extent, if it had been, I'm glad that the medical testimony had said, no, this was a result of a pattern of chronic abuse. That would be one thing, but I didn't read that from the medical testimony. Did you? I think the, the medical opinion was unanimous that this was inflicted injury and that it was, it was child abuse. I don't know that they, that there was ever a statement that this was a quote pattern of child abuse. I believe all of the injuries had to have occurred within seven to 10 days of when she died. So, I don't know that that would be a pattern of child abuse, but you also have, you know, Lisa's explanation as to why she didn't know that these injuries could have occurred. She was steadfast in saying, my daughter was sick, she had thrush, and she cried all the time. And so, that is the reason why I did not know that these injuries had occurred prior to her death, these other broken limb injuries. The state pressed her on that, the defense pressed her on that, and she remained steadfast. That was the reason she didn't know. And the medical records support her claim in that. Just a month prior, less than a month prior, she took Susie to the hospital and got treated by Dr. Robeson for having thrush in her throat, and ulcers in her throat. And he stated at that time, there was, there was no, there was no bruising, there was no indication of abuse whatsoever. And so, you also have that explanation in these interviews and at trial as to why she didn't know that. Excuse me, I think Judge Harris has a question for you. Sorry, just because I see we're running short of time. I just wanted to ask you a procedural question. I think you suggest in your brief that we shouldn't even be reaching these issues, Brady claim, the NAPU claim, because there wasn't an objection to the footnote at the end of the magistrate judge's report where he says he doesn't have to decide these claims. Is that, is that your position? Are we, are we, is this whole argument a waste of our time because these issues are waived? No, ma'am. Yesterday, I filed an unopposed to withdraw that, that argument. Great, didn't get it. Thank you. Thank you. Let me ask you a question before you leave with this. I think it's just an interesting consideration. Twenty-four, 2254 D cases, of course, have very limited review. We understand that quite well. There are exceptions, and among the exceptions would be if the record is materially incomplete. And so, in this instance, we do have information that this in fact, it did not. How does, does that come into play? Because it wasn't until 15 years later or so that you get this other, other, other transcript. So, how does that affect our review of the 24, 2254 D? I agree that the 2015 transcript was not before the state court. However, going back to what Judge Wilkinson was saying is that in order to kind of open up and do a de novo review, it would have to fundamentally alter his claim. And it doesn't because the state court had the substance. It didn't have this particular interview, but the contents of that interview, it was before the state court. There's nothing new in this 2015 tape recording. And in fact, the transcription, the written transcription that was turned over in 1998 wasn't even part of the Brady claim. This is just something that was additionally found later on and was consented to be included in the record. But it doesn't, there's no new information here. So, it doesn't make the trial court's findings of fact unreasonable. It doesn't present this case in a new light. It doesn't fundamentally alter the defendant's claims. Thank you. Are there any further questions here from either of you? No. If not, we will, um, we'll be pleased to hear from Mr. Cooney on the bottom. Mr. Cooney? You need to turn on your audio, Mr. Cooney. We're not hearing you. There you go. I'm sorry about that. Judge Wynne, if I can address your question at the outset. One of the ways in which this case can be reopened for fact finding is if the state post-conviction court employed a materially incomplete fact-finding process. Now, we know the state post-conviction court didn't have a hearing. The state has suggested that, well, the new transcript in 2015 wasn't even part of the Brady claim. Well, it wasn't part of the Brady claim because defense counsel didn't have it. That transcript wasn't provided. The fact of the matter is the state first represented on the first motion for appropriate relief, oh, we've got open file discovery. You've got everything. It takes a remand of the North Carolina Supreme Court and suddenly, oh, here are these transcripts we have, but they still don't turn over all the tape recorders of all the interviews that are going on, and those don't get completed until 2015. So, how does that alter the nature of the claim? I mean, I don't understand because I think that, you know, that Bridges and Scott, as I read the transcript in its totality, were somewhat tangential witnesses, and I think the previous, our previous opinion recognized that to be such, and how does it, I don't understand how it alters anything. I mean, this is a problem. If you keep these things going so far, then whoops, now we've altered the standard of review from our normal one of deference to the MAR court into something that's very close to de novo, and I don't understand how we get there, because I just don't, if Bridges was a central witness in this or if her testimony had been emphatic and compelling in one sense or another, but she wasn't, and you have to have that, the state court's finding on the materiality must come into play here, and he says in terms of the materiality, the superior court said that the evidence from Bridges was only tangentially relevant, and he says the same thing with Scott, and now we're trying to take that finding about Bridges being only a tangentially relevant witness, and we're trying to make her into a central witness on behalf of a theory having to do with all from Scott that, as Ms. Callahan pointed out, was not even at issue in the trial, and so it seems to me that we are in danger of undermining the whole standard of review that Congress and the Supreme Court have set up for us, because we still have that materiality finding, and you just can't say, all right, all of a sudden Lisa Bridges becomes the key witness, the central witness, when she simply was not, and that isn't what the trial turned on, it wasn't what the trial could have turned on, and I don't see how we get around that, and particularly while we're trying to make her a central witness on behalf of a theory which was never advanced at trial. It just seems to me we're fundamentally trying to transform and maintain the whole shape of the case. Your Honor, if I could respond briefly, no witness at trial was examined for the length, either on direct or cross examination, as much as Lisa Bridges, and it's not even close. Her transcript at trial probably runs two to three times the size of the transcript of any other witness at trial, and I think that can be many explanations for that, and the materiality finding of the state court made depended on the doctor's testimony at great length, and it depended on Mr. Burr's testimony, and sometimes you don't want to examine the doctors at great length, because as a matter of trial strategy, the doctor's testimony is so unfavorable to the defendant's case that you want to get them off the stand as quickly as you possibly can, and so I don't go from a trial lawyer's perspective who's saying that the length of an examination is necessarily correlated to the critical nature of the testimony. Do you see what I'm saying? I do, Your Honor, and certainly I have been in those situations, but I can tell you the prosecutor's direct examination of Lisa Bridges also dwarfed the direct examination of any other witness in the case. She was the central witness from that perspective in the case. Maybe you think she's a central witness, but we have the state court's finding that she was tangential, and that's a materiality finding, and we have our previous case that in its finding of no prejudice under the IAC claim reinforces that very point. Well, again, I think you and I disagree. I understand the link between the materiality on prejudice and the IAC claim, but it's a different measure under Brady because the issue under Brady is how could the defense lawyer have used it? How could the defense lawyer have transformed the case? It's about what ifs necessarily in Brady in ways that the prejudice standard deals with what actually happened because of limitations of defense counsel's decisions, and I understand I am bound by your prior decision, so I'm not attempting to reopen that, and I'm way over my time, and I apologize, Your Honor. It's an important case, Mr. Cooney, and I want to make sure that you have every chance to get your point of view out. Do you have concluding comments you wish to make? I do. I guess two. First, I direct the court to, we hadn't talked much about Scott Engle, but in terms of Scott Engle's suppressed statement, one important thing is he testified for the first time that defense counsel was hearing a trial about this beat he heard to permit the prosecutor to argue he was listening to the burr beat the next room, but if you take a look at 1630 and 1631 of his transcript, he completely undercuts that. I mean, that's totally opposite to his testament, and again, 10-year-old children are hard to cross-examine in a courtroom, but this would have been one way to demonstrate the unreliability of this particular witness. Thank you. Thank you, Your Honor. Are there any questions from either of my co-panelists? I'm happy to wait until you ask all the questions you wish. I have none. I'm all set. Thank you. All right. Thank you, Ms. Callahan, and I see that you're court-appointed, Mr. Cooney, and I wish you had prepared and presented your case. Thank you very much on behalf of the court. Thank you, Your Honor.
judges: J. Harvie Wilkinson III, James Andrew Wynn, Pamela A. Harris